## Doran *v.* Pittsburgh Railways Company et al., Appellants.

Argued October 3, 1941. Before SCHAFFER, C. J.; MAXEY, DREW, LINN, STERN and PATTERSON, JJ.

*William A. Challener, Jr.,* with him *William A. Challener,* for appellant No. 158.

*James R. Orr,* with him *J. R. McNary,* for appellants Nos. 159 and 160.

*Dennis J. Mulvihill,* with him *James L. O'Toole, Jr.,* for appellee.

OPINION BY MR. CHIEF JUSTICE SCHAFFER, December 2, 1941:

Plaintiff was injured when the automobile he owned and was driving was struck on a public crossing by a two-car electric freight train operated by both defendants. The jury awarded plaintiff $30,000. The court entered judgment on the verdict. Defendants appeal.

Appellants raise the contention, in making the claim, that plaintiff was contributorily negligent and that judgment should be entered in their favor, that he left a place of safety and assumed a dangerous position on the tracks. We think, when the evidence is taken as a whole, and when thus focused for attention, the question of contributory negligence was for the jury.

The street car tracks, two in number, are located in the center of Ardmore Boulevard. The Boulevard is wide, with much travel upon it, forming as it does part of the Lincoln Highway entering Pittsburgh. On each side of the railway tracks are three lane one-direction

highways. The scene of the collision was the Research Crossing of the tracks, a public crossing. Plaintiff, on his way home about 11 o'clock on a clear night, turned his automobile to the left from the line of traffic on the roadway onto the crossing, 27 feet long, intending to move over it and again turn to the left on the roadway on the other side in the direction of his home. He stopped his car before entering upon the crossing, looked in both directions to see whether there were any street cars on the tracks, and observed none. He looked to see how the traffic was on the other side of the Boulevard into which he intended to drive, and saw there were cars coming, traffic was "pretty heavy." When he got on the crossing, his automobile on the far track, the traffic increased and he was compelled to stop, as he could not enter the line of traffic without danger to those there traveling. Another automobile entered the crossing from the opposite direction. He remained stationary for about two minutes, his engine running, watching for an opening in the traffic, when he was struck by the freight train, traveling, so he testified, at a speed of 50 to 55 miles an hour. His car was demolished and he received the injuries of which he complains. Plaintiff observed the train coming toward him when it was about 400 feet distant. He could not move his automobile without danger to others. Owing to the speed of the oncoming train, he felt that he could not abandon his car without grave danger to himself. The operator of the train had an unobstructed view of plaintiff's car along a straight track for 300 feet and from a point on a curve a clear view of 794 feet. The motorman testified that he did not observe the automobile on the track until he was about 125 feet away from it, when he testified it "pulled" on the crossing in front of him. When account is taken of the fact that the crossing is a public one, and the situation which confronted plaintiff, due to the increased traffic on the roadway into which he intended to turn, we cannot say as a matter of law that his action in entering upon the crossing con-

victs him of contributory negligence. The operator of the freight train had ample time to see him and his predicament had he been keenly watchful, as he was bound to be in approaching the public crossing and to have avoided striking him. We decided in *Sexauer v. Pittsburgh Rys. Co.*, 305 Pa. 319, 157 A. 603, that where the driver of a truck is forced to halt on a street railway track because of the speed of an approaching automobile, it is the duty of the motorman of a street car following the automobile to take notice of the situation and stop his car, so that the truck may clear the track.

*Mackey v. Phila. & West Chester Traction Co.*, 227 Pa. 482, 76 A. 201, is quite parallel to the present case. There a four-horse team was driven out of a private driveway onto the tracks of the railway company. Before entering upon the tracks, the two men in charge of the team looked to see if any car was approaching and none was in sight. They could see for 560 feet along the tracks. The team was started but, before it could clear the tracks, was struck by a car and Mackey, the driver, was killed. We there said (p. 486) : "When it [the car] was yet some 560 feet distant from the crossing and the team, the motorman must have had warning that the track in front of him was not clear; it was then incumbent upon him to get his car under good control and approach the crossing with caution, prepared to stop, if necessary." On the question of contributory negligence, it was said (p. 487) : "As to the question of contributory negligence upon the part of the driver of the team, in such a case as this, that can only properly be so pronounced by the judge as a matter of law, when the evidence is clear and undisputed, that in attempting to cross the tracks, he has driven in front of an approaching car, when it was so near to him that the motorman could not reasonably be expected to stop his car in time to prevent the collision. But when there is testimony as in this case, that with a long and unobstructed view of the tracks, no car was to be seen when the driver reached the edge of the line,

and that the space between the point where a possible approaching car would appear and the line of the crossing was such as would seem ample under ordinary circumstances to permit of safe passage; when, notwithstanding such an alleged situation, during an attempted crossing of the tracks, a collision occurs, it seems to us that the questions of negligence and contributory negligence should properly be left to the determination of the jury." Plaintiff had a right to expect that if he was compelled to stop on the tracks, the operator of the cars would exercise reasonable care to avoid striking him: *Weschler v. Buffalo & Lake Erie Traction Co.*, 293 Pa. 472, 143 A. 119; *Barth v. Lackawanna & Wyoming Valley R. R. Co.*, 310 Pa. 168, 165 A. 251.

This brings us to the question: Is the verdict of $30,000 excessive? At the time of the injury, plaintiff was 49 years' old, employed as a policeman by the Westinghouse Company. He was badly shaken up in the collision, but no bones were broken except possibly a small fragment of one of his spinal processes. This does not seem, from the testimony of the physicians, to be of much moment. The doctor called by plaintiff, who first attended him, said he complained of a pain in the right shoulder, the right side of his chest and back and some pain in his right leg and right ankle, these spots were contused. He was tender over the back. The day following the accident, the whole side of his chest turned black and blue. This doctor attended him for a year, his shoulder and chest cleared up, but he continued to have severe pains in his back and lost weight.

A specialist in orthopedic surgery, called by plaintiff, who saw him something over a year after he was injured, said that he complained chiefly of pain in the center of his lower back and down his back to both knees. He was wearing a brace. On examination, the surgeon found that he had a marked fixation of the dorsal spine, including the upper lumbar. He advised that plaintiff go to a hospital, where he remained for about

six months under the surgeon's care. He received treatment consisting of rest, counter-irritation, massage and baking. He was given a removable body cast to give fixation and rest to his spine, which he has worn ever since. On examination shortly before the trial, the surgeon found him worse than when he left the hospital. His spinal movements were somewhat limited, but not so much as when first examined. X-rays showed that he has certain congenital spinal deficiencies. The diagnosis was that he had "an exhaustive traumatic neurosis superinduced by the accident, a depletion of the nervous system due to constant pain and distress so that the patient himself loses weight, goes downhill and loses the power to come back and overcome his traumatic condition." Asked by plaintiff's counsel as to the likelihood of recovery, the surgeon answered, "I don't see why he shouldn't recover. It will take him some time, but it will require a lot of rest and close attention and building up to do it. . . . What he needs particularly is rest and environment where he will pull himself out of this mental attitude as well as physical attitude. His physical condition will affect his mental attitude." He stated that he thought he would never be able to do heavy work, and that he would need "plenty of" medical attention in the future. He was unable to state whether he would continue to suffer pain from the accident.

Another doctor who treated him was called by plaintiff. After stating what conditions he found, in the main as depicted by the other doctors, he gave it as his opinion that plaintiff's health is permanently impaired, that he will always have trouble with his back, that he will have need in the future for medical attention because of the accident and that he will have pain in the future. He testified that there was no injury done to the body of the vertebra and none to the spinal cord, and that there was no nerve paralysis.

It will thus be seen that there was a conflict between the physicians called by plaintiff, the orthopedic sur-

geon having testified that plaintiff would recover, and the last one called, stating that his condition would continue. It would seem obvious from the size of the verdict that the jury must have based its award upon the testimony of this last witness. We commented upon testimony given by him in *Murphy v. Penna. R. R. Co.,* 292 Pa. 213, 216, 140 A. 867, and in *Nickolls v. Personal Finance Co.,* 322 Pa. 67, 69, 185 A. 286, and need not repeat what we there said, except to remark that we have not been inclined to place too much reliance upon his testimony.

In an endeavor to justify the amount of the verdict, the court stated that at the time of trial plaintiff had an expectancy of 18.97 years and that he would earn $43,-251.60, which reduced to present worth and capitalized at 5%, made his loss of future earnings $27,554,48, and that this, together with the actual loss to the date of trial, would be more than the amount of the verdict. We think such a calculation does not meet the requirements of sound judgment to be exercised in passing upon verdicts alleged to be excessive. No account is taken in this calculation of loss of time or of diminution of earning power as age comes on.

We are impressed with the thought that the verdict was too high. Two alternatives are open, to grant a new trial or to reduce the judgment. We think the latter course is the preferable one under the situation and we, therefore, reduce the verdict and judgment to $20,000.

Other questions raised in connection with the motion for a new trial are: (1) that the court improperly charged that the rights of defendants and plaintiff, in the use of the crossing, were equal; (2) evidence as to the speed of the cars was improperly admitted. We think these matters are of no moment when the evidence is taken as a whole.

The judgment, as reduced, is affirmed.