## Grotefend *v.* Pennsylvania Railroad Company.

Argued September 28, 1954. Before STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

Bruce R. Martin, with him Dalzell, Pringle, Bredin & Martin, for appellant.

Wallace E. Edgecombe and Kenneth P. Christman, for appellees.

OPINION BY MR. JUSTICE ARNOLD, January 13, 1955:

In this action of trespass the jury rendered a verdict for plaintiffs against all defendants for damages to their automobile, and defendant-railroad appeals from the refusal of its motion for judgment n.o.v. The other defendants have not appealed. W. I. Worsham & Bros. were the owners, and Marlow the driver, of the tractor-trailer involved.

It is recognized by all parties that plaintiffs are without fault, but the railroad contends that there was no proof of negligence making it responsible in damages.

The accident happened at the Ferry Street crossing of defendant-railroad in East Deer Township. Ferry Street, which carries heavy vehicular traffic, runs north and south and is crossed by the tracks of defendant railroad which run east and west. There had been a heavy snowfall which ended on the morning of the day the accident occurred. As a result, the snow was well packed, the roads icy, and driving hazardous.

At about 5:00 P.M. the plaintiffs' car was legally parked in a parking lot near the crossing. Marlow drove his empty tractor-trailer onto the crossing, and as he did so his wheels became stuck on the rails. Despite his efforts the wheels continued to spin without moving the vehicle forward or backward. Defendant's train, travelling from west to east, struck the tractor and hurled it into plaintiffs' automobile.

Plaintiffs' testimony was that the tractor-trailer had been stuck on the rails some three to five minutes prior to the approach of the train; that from *a* point on the crossing, but not where the truck was stopped, the view in the direction of the train was clear for approximately one-half mile. But their evidence further showed that between the crossing and the train there was a bend in the tracks and that a number of railroad cars were stopped on a siding which parallels the main track. The witnesses also stated that, standing east of the crossing, these would obscure the view to the west. One witness stated that he had not stood in the eastbound track and looked west; and the other stated that from the north rail of the track he would not see the train because of the bend and the cars on the siding. It was not established that the crew had the view claimed or that they could have stopped soon enough to avoid the accident. Nor was it shown that the train crew knew or should have known that the tractor was on the tracks, in sufficient time to have stopped before striking it. Neither was there any proof that no audible warning of the train's approach was given, although there was proof that the "flasher signals" were flashing and gave notice of its approach. None of the witnesses testified that they would have heard a whistle if it had been blown. The proof falls far short of proving negligent operation of the train. The following from *Guyler v. Lehigh Valley Railroad Company,* 165 Pa. Superior Ct. 196, 198, 67 A. 2d 575, is applicable here: "This was not a case of an engineman having knowledge,—and sufficient time to act upon it,—that a vehicle had stopped or stalled upon a crossing which he was approaching." Here there is no such proof,—nothing to show that the crew should have seen the tractor-trailer at the point where it stopped.

Plaintiffs also contend that there was sufficient evidence of negligence in maintaining the crossing to sustain the verdict against the railroad. Their claim is that it was permitted to get into and remain in a state of disrepair, so that the resulting "holes" caused the tractor-trailer to get stuck. But, in this they also failed to sustain their burden. Their testimony established that despite the heavy snow and ice, the hazardous driving conditions, and the fact that one of the rear tires was smooth (which, if it spun would prevent the vehicle from moving), the tractor-trailer was not equipped with chains or any device to combat such conditions. They further established that the "ruts" were formed by the clear rails and the snow packing on the remaining portion of the crossing. There was no proof that the crossing was then in disrepair, although it was shown that there had been some complaints about its condition. Nor was it established that any defect resulting from disrepair caused the vehicle to be stuck on the crossing. On the contrary, the testimony was definite that the snow, rather than any defect in the crossing, caused the wheels to spin. Nor was there any evidence that the snow or ice should or could have been removed. In addition, the driver of the tractor-trailer testified that all of the road, including the crossing, was "icy."

The only conclusion must be that the accident was caused solely and directly by the negligence of the driver of the tractor-trailer, and that the icy condition of the rails was merely part of the general condition resulting from the heavy fall of snow, and not negligence in the railroad. Cf. *Hoffman v. Philadelphia Transportation Company*, 369 Pa. 212, 85 A. 2d 144; *Low v. Harrisburg Railways Co.*, 290 Pa. 365, 138 A. 852.

Plaintiffs point out that a track foreman testified that he had put a hole in a plank of the crossing some time prior to the accident, but it was not shown that this hole had anything to do with the tractor-trailer's being stuck. There being no proof of actionable negligence, the jury will not be permitted to guess.

Reversed as to defendant, Pennsylvania Railroad Company, and judgment entered for it non obstante veredicto.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Majority Opinion sweeps over the evidence in this case like an express train shooting across a trestle, ignoring signals, semaphores and swinging lanterns. It says that the plaintiffs proved no negligence on the part of the railroad. Like a wreck train blowing alarm warnings as it pushes its way through an enveloping fog, the record shouts negligence throughout the entire length of its 200 pages.

On January 15, 1951, a typical wintry day with ice and snow covering the ground, A. W. Grotefend parked his automobile on private property adjacent to the tracks of the Pennsylvania Railroad in the vicinity of the crossing at Ferry Street in East Deer Township, Allegheny County. At about 5 p.m. of that day, Lester Marlow driving a huge tractor-trailer started over the crossing, but, arriving at the center of the crossing, his vehicle bogged down into ruts and depressions which, combined with the accumulated ice, made traction impossible. While he was thus helplessly immobilized, seeking desperately to move either forward or backward, a train approaching from the west, and without diminishing its speed, crashed into the trailer-truck with such violence as to hurl it 75 feet through the air and on to the top of the Grotefend

automobile, demolishing it entirely. The owners of the car (A. W. Grotefend and Elizabeth Grotefend, his wife), recovered a verdict against the railroad company which appealed to this Court. The Majority now enters a judgment in favor of the railroad company notwithstanding the jury's verdict.

Hundreds of decisions have been handed down by this Court on varying responsibility for railroad crossing accidents, but the question involved in a case of this kind is a very simple one, namely, did the railroad company exercise reasonable care and prudence under the circumstances? In *Cummings v. P. R. R.,* 301 Pa. 39, 42, this Court, speaking through Justice FRAZER, said: "The question which the jury has been permitted to decide . . . [is] whether, under the circumstances shown in a given case, the railroad company exercised reasonable care and prudence in what it did and whether such neglect caused the injury complained of. This rule does not permit a jury to decide in what manner a railroad company should perform its duty to the public at a particular point and to substitute its judgment for that of the company's proper officers, but merely permits them to *pass on the question whether, under the circumstances described, taking into consideration the physical conditions of the crossing, the extent of its use by the public, the nature of the surroundings, the speed of the train, and other matters tending to show exceptional dangers incident to the particular locality, they performed their duty toward persons* using the highway." *

Did the railroad company here perform its duty toward the stalled tractor-trailer and, by chain of events, to the owners of the Grotefend automobile parked far enough away from the crossing to be ut-

---

* (Italics throughout, mine.)

terly free of even the suspicion of fault?

The stalled tractor-trailer had been seeking to extricate itself from its dilemma for from three to five minutes before the blinker signals began to operate, which means that the train at that time was 2,885 feet away (the distance between the actuation point and the crossing.) As the train approached to 25 car lengths from the crossing (1,000 feet), the fireman warned the engineer that there was "trouble up at the crossing." The engineer, who stated that he was travelling 35 miles per hour, testified that when 800 feet from the crossing he saw the obstruction and applied his emergency brake. If he was travelling only 35 miles per hour, is it possible that with all the multiple air brakes on a modern locomotive he could not have stopped, or at least have reduced his speed to the point that he would not have hurtled the tractor-trailer 75 feet? Police officer Novasatt, witness to the accident, testified that the locomotive travelled 1,000 feet after the collision. Further, that he heard the air brakes being applied on the train *after* the collision: "Q. You worked around this crossing for a long time. Have you become accustomed to that kind of sound on a train. I mean this sound of the air, had you heard that kind of sound before frequently or not? A. Yes, sir. Q. What is that the sound of? What is happening when you hear that sound? A. Applying the brakes. Q. That is, there are air brakes on these cars and this is the sound of the air being applied to the brakes? A. Yes, sir. Q. When did you first hear that sound? A. The train was already passing the crossing when I heard that sound go through the train. Q. Was that before or after it hit the truck? A. *After it hit the truck.*"

Witness James Vensel also testified that he did not hear the sound of the air brakes until *after* the crash:

"Q. When did you first hear that sound? A. I think at the time of the crash, or shortly after the crash."

The conductor of the train, Mont Andrew Snyder, testified that the locomotive went 15 to 20 car lengths beyond the crossing before it stopped. He also said that after the emergency brakes went on, the train travelled 15 to 20 car lengths before it stopped. The inevitable deduction from that combined testimony is that the emergency *brakes were not applied until the locomotive actually hit the truck.*

From all this evidence, plus the fact that the loco‑ motive shot the tractor-trailer through the air like a huge arrow from a gigantic bow, the jury had the right to believe and undoubtedly did believe that the engi‑ neer had not made any attempt to slow down his train until he actually collided full tilt against the belea‑ guered vehicle. This fact alone would constitute the negligence which would make the railroad company liable in damages for the accident.

For 17 years the engineer had travelled this par‑ ticular route. He knew the Ferry Street crossing like he knew the gauges of his locomotive, he was cognizant also of the fact that at 5 o'clock of an evening vehicu‑ lar traffic at this point was at its height. He testified that "it was a dangerous crossing at that time of the day . . . because of so much traffic." Yet, in spite of this fact-situation which summoned him to the maximum of wariness and care, he plunged into the crossing as if he were travelling through the country without an intersecting highway for a hundred miles. Even after audible and visual warning of the obstruction which lay athwart his track, he sped on with unabated veloc‑ ity on the evident assumption that the obstruction would eventually animate enough to arise and get out of his way.

The Majority Opinion quotes from the case of *Guyler v. Lehigh Valley Railroad Company*, 165 Pa. Superior Ct. 186, 198, as follows: "This was not a case of an engineman having knowledge,—and sufficient time to act upon it,—that a vehicle had stopped or stalled upon a crossing which he was approaching." The fact of the matter, however, is that it *is* a case of an engineman having knowledge, with sufficient time to act upon it, that a vehicle was stalled on the crossing he was approaching.

In *Doran v. Pittsburgh Railways Co. et al.*, 343 Pa. 204, 206, a truck, while stymied at a crossing because of congested traffic, was struck by an electric freight train. In affirming the verdict awarded by the jury, this Court said: "The operator of the train had an unobstructed view of plaintiffs' car along a straight track for 300 feet and from a point on a curve a clear view of 794 feet. . . The operator of the freight train had ample time to see him and his predicament had he been keenly watchful, as he was bound to be in approaching the public crossing and to have avoided striking him."

In *Mackey v. Phila. & West Chester Traction Co.*, 227 Pa. 482, this Court said, in affirming a verdict rendered in a railroad crossing accident case: "when it (the car) was yet some 560 feet distant from the crossing and the team, the motorman must have had warning that the track in front of him was not clear; *it was then incumbent upon him to get his car under good control and approach the crossing with caution, prepared to stop, if necessary.*"

When here the engineer learned from his fireman that there was "trouble ahead" his duty was to approach the "crossing with caution, prepared to stop, if necessary." Whether he exercised that caution was definitely a question for the jury.

The Majority Opinion says that "It was not established that the crew had the view claimed or that they could have stopped soon enough to avoid the accident." That also was a matter for the jury. The plaintiff A. W. Grotefend testified that from the railroad crossing one can see west along the track for a half mile. The converse, of course, would be true. The Majority Opinion says that "between the crossing and the train there was a bend in the tracks that a number of railroad cars were stopped on a siding which parallels the main track," and that "these would obscure the view to the west." But Grotefend testified: "Q. Would your view that far (one-half mile) be obstructed by the presence of box cars along this siding track shown on the left side of the photograph? A. No, I don't think it would. I don't think the bend is heavy enough at that point."

The Majority here utterly ignores the fundamental rule that on appeal, all inferences deducible from the evidence are to be interpreted in the light most favorable to the verdict-winner, the plaintiffs in this case.

The Majority Opinion says: "Neither was there any proof that no audible warning of the train's approach was given." Rosemary Renda, who witnessed the accident, testified: "Q. What happened? A. The train hit the truck and flew in the air and hit a car that was in the employment parking space. Q. *Did you hear any train whistle? A. No, I didn't.*" Olive Stepp, another witness, testified: "Q. Then what happened? A. The train hit the trailer. It flew in the air, hit the parked car, and into the side of the Pittsburgh Plate building. Q. *Did you hear any train whistle*? A. *No, sir.*" The Police Officer Novasatt testified: "Did you hear the train give a whistle? A. To my recollection, *I did not hear a whistle blown.*"

With the record thus definitively refuting the Majority's statement that there was no proof that no audible warning was given, the Majority then argues that "none of the witnesses testified that they would have heard a whistle if it had been blown." This presents a rather strange brand of logic. If a witness says he heard a whistle blown he is believed, but if a witness testifies he did not hear a whistle blown he is not to be believed unless he also says that if a whistle had been blown he would have heard it. Using this standard of reasoning, a witness who says he *did* hear a whistle blown should also be required to state that if one had *not* been blown, he would *not* have heard it!

According to the criterion of proof advanced by the Majority, if a witness who listened to a band concert testifies that he did not hear the Star Spangled Banner played he cannot be believed unless he adds that if the Star Spangled Banner had been played he would have heard it. To give another illustration: If a witness in a murder case testifies he did not hear a shot fired he is not to be believed unless he testifies that if a shot had been fired he would have heard it.

If this measure of evidence is to apply to the sense of hearing, why shouldn't it likewise apply to the sense of sight? Thus, if a person testifies he witnessed a circus parade and that he did not see any elephants in the parade, he must also say that if elephants had been in the parade he would have seen them.

However, in this case the question as to whether the whistle was or was not blown is sheerly irrelevant. The train could have been shrieking to the high heavens, but even that din could not have drowned out the railroad's responsibility which was so evident. There was no need to notify the truck driver about the train's approach. He knew only too well that the locomotive was ominously thundering toward him. What

he wanted was time to get out of the trap into which he had innocently fallen. The engineer knew that a truck was before him and the issue is whether he made any effort to avoid striking it. The jury was justified in concluding that despite his knowledge of the defenseless situation at the crossing, the engineer ploughed on regardless.

The Majority Opinion says: "Plaintiffs also contend that there was sufficient evidence of negligence in maintaining the crossing to sustain the verdict against the railroad. Their claim is that it was permitted to get into and remain in a state of disrepair, so that the resulting 'holes' caused the tractor-trailer to get stuck. But, in this they also failed to sustain their burden."

Here, again, the Majority is in error. The record overwhelmingly shows that the plaintiffs successfully carried the burden of proof with regard to the negligent condition of the crossing. Sebastian DeNunzio, track foreman for the railroad company, testified that he himself "made a hole" in the surface of the crossing: "Q. You spoke of a hole there. Where is that hole? A. Right in the crossing plank. Q. In the plank? A. Yes. Q. Had you ever seen that hole there? A. *I made it.* Q. You made it? A. That's right."

He testified further that the Township policeman constantly complained to him about the bad condition of the crossing: "A. He (the policeman) told me to patch up holes and to repair the crossing; and to repair the crossing, that is a big job. We generally patch up holes. Q. What do you mean by patching up holes? A. The holes that works the black top loose away from the rails, and we generally go around and patch it up. Q. What works the black top loose away from the rails? A. Vibration of the trains, I suppose."

The Majority Opinion says that "there was no proof that the crossing was then in disrepair." But Officer Novasatt testified that there was a rut 6 inches deep at the very point where the tractor-trailer was stalled. He also testified that he notified the railroad foreman about the bad condition of the crossing: "Q. What did you tell him? A. The exact words? I told him it was a shame the way the crossing was kept. Q. Did you point out any specific illustration of what you were talking about? A. Yes. Q. What did you show him? A. *The holes in the crossing.* Q. Do you know when that was? A. *Prior to the accident* and after the accident. Q. Well, how long prior to the accident? A. I couldn't tell you the exact time. Q. Can you estimate? A. Approximately a month or two before that. Q. You definitely know he was an employee of the Railroad? A. Yes, sir, definitely. The Court: Q. You know he is a track foreman? A. Yes, sir."

It seems that the condition of the crossing had reached such a state of delapidation that people joked about it. The track foreman DeNunzio testified: "Q. Did I understand you to say he [Officer Novasat] did complain to you about the condition of the crossing? A. He is always joking with me about this crossing. Q. I am not talking about jokes. A. That is a fact. Q. Did he complain to you about the condition of the crossing? A. Sure. When we were patching the crossing he would say, 'Well, are you patching the crossing?' Every time he saw me there he would talk about the crossing. Q. Did he complain about the condition of the crossing? A. He would complain about when we were going to rebuild it. I said, 'Rebuild a crossing is a big job.' We had to wait until we got the materials."

And then, pyramiding its disproved contentions, the Majority says: "Nor was it established that any defect resulting from the disrepair caused the vehicle to be stuck on the crossing." The record flatly contradicts this assertion. Officer Novasatt was asked whether he observed what "was keeping the truck from moving forward." He replied: ". . . The front end of the tractor wheels, the front end, was *in the rut* on the third rail looking north. Q. What was the nature of that rail at that point? A. The rut was at least approximately six inches deep there. Q. What was six inches deep? A. The rail was down in and as the traffic kept moving over sort of *made a hump and a gutter in there.* Q. Was the rail below the surface of the roadway? A. Yes, sir. Q. What was the condition of the roadway at that place where the front wheel was located? A. *It was dug in.*"

Sophie Augusty, a witness called by the *defendant,* testified that she saw the truck on the crossing: "It had approached the crossing and it couldn't go forward. *It was stopped in the ruts in the crossing.*"

In conclusion, we have here a case of negligent maintenance of a railroad crossing, a negligent, careless and callousedly indifferent approach to that crossing with visual knowledge of an obstruction on the track, a failure to adjust the speed of the train to cautionary advance, and a collision which, through the intervening agency of an inert tractor-trailer, destroys an automobile 75 feet away. It requires some rather brave and accurate reasoning with some formidable display of precedent and authority to strike down a jury's verdict on a fact-situation of that character. I fail to find in the Majority Opinion any such reasoning or any such parade of authority. One would have to search rather diligently through the law books

to find a case where negligence was more clearly established than it has been in this case.

Because of his experience on January 31, 1951, A. W. Grotefend will undoubtedly never park an automobile in the vicinity of a railroad track again, but from his experience with this lawsuit he will undoubtedly also feel that he should remain far away from the courts because, from his point of view, a collision with court-inspired law can be as devastating as a collision with a railroad locomotive.